UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF RICHIE MAJORS,
et al.,

        Plaintiffs,                              Case No. 16-13672
                                                     Hon. Mark A. Goldsmith
vs.

ROGER A. GERLACH, et al.,

        Defendant.
_____/

**OPINION & ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS AND TO TRANSFER VENUE (Dkt. 29)**

In this civil rights case, Defendants are alleged to have violated Plaintiff's decedent's Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his medical needs while he was under their care in the custody of the Michigan Department of Corrections ("MDOC").[1] Before the Court is a motion to dismiss filed by three of the twelve named defendants (Dkt. 29) and joined by one other (Dkt. 30). A hearing on the motion was held on May 25, 2017. For the reasons set forth below, the motion is granted in part and denied in part, and Defendant Roger A. Gerlach is dismissed from the case.

**I. BACKGROUND**

In March 2010, Plaintiff's decedent, Richie Majors, began his prison sentence with MDOC in Ionia, Michigan. Am. Compl. ¶ 20 (Dkt. 24). During intake, Majors told staff that he

---

[1] Although the complaint identifies two plaintiffs — the personal representative of the estate and the decedent's estate — this Court will refer to the personal representative as the sole Plaintiff. See Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C., 693 F. Supp. 2d 4, 16 (D.D.C. 2010) ("As a general rule, under Fed. R. Civ. P. 17(a), the estate cannot be a plaintiff in a lawsuit.").

had multiple sclerosis, or "MS." Id. ¶ 21. He also told them of his treatment regimen, which he had received when incarcerated by the Minnesota Department of Corrections ("MNDOC") for a prior term of imprisonment. Id. At the time of intake with MDOC, staff determined that he was asymptomatic and stable. Id. ¶ 23.

Gerlach was a licensed physician who was employed by MDOC as the medical director and site physician at the prison located in Ionia, Michigan. Id. ¶ 3. In July 2010, Gerlach evaluated Majors's MNDOC records, learning about his MS diagnosis and treatment regimen. Gerlach declined to prescribe this treatment and "questioned" Majors's diagnosis. Id. ¶ 24.

Majors suffered relapses in October 2010 and August 2011 and reported them; but Gerlach refused to order tests or prescribe Majors's stated treatment regimen. Id. ¶¶ 25-27. Plaintiff alleges that Majors "kited," or complained to, the Ionia staff about their refusal to prescribe his medication. Id. ¶ 29.

In December 2012, MDOC transferred Majors to a prison in Adrian, Michigan. Id. ¶ 28. There, Defendant Savithri Kakani, who was a physician assistant employed by MDOC at the Adrian prison, id. ¶ 8, reviewed Majors's history from MNDOC, including his diagnosis and treatment, as well as his subsequent history of relapses. Like Gerlach, Kakani refused to prescribe the treatment regimen and to conduct diagnostics to confirm the MS diagnosis. Id. ¶ 30.

In July 2014, MDOC transferred Majors from Adrian to a prison in Muskegon Heights, Michigan. Id. ¶ 31. In August 2014, Majors suffered steady deterioration, resulting in problems with his speech, facial muscles, and walking. Id. ¶ 33. By September 2014, he was in a wheelchair, but still no doctors sought to confirm Majors's MS diagnosis and no one recommended that he be given his treatment. Id. ¶ 34.

From January 2013 to September 2014, Majors "kited or complained" to Kakani, as well as Defendants Renee Vives and Heidi Herman (nurse practitioners at the Adrian prison, id. ¶¶ 6-7); John Solomonson (a registered nurse at the Adrian prison, id. ¶ 9); Karen Rich, Joel Evertsen, and Dorinda Blohm (registered nurses at the Muskegon Heights prison, id. ¶¶ 10-12); Thomas LaNore (a physician assistant at the Muskegon Heights prison, id. ¶ 13); and Susan Howard (a medical doctor at the Muskegon Heights prison, id. ¶ 14) at least 17 times, seeking to obtain his treatment. Id. ¶ 32.

In September 2014, a nonparty physician sent Majors for an MRI, confirming his diagnosis. Id. ¶ 35. In October 2014, LaNore prescribed Majors's treatment that he received in MNDOC. Id. ¶ 36. Nonetheless, extensive deterioration followed. In April 2015, MDOC transferred Majors to the Saint Louis, Michigan prison. Id. ¶ 38. On June 19, 2016, Majors died due to complications from MS. Id. ¶ 42.

There are eight "nurse" defendants and four "physician" defendants. The instant motion was filed by Gerlach, Kakani, and LaNore (all physician defendants) and joined by Vives (a nurse defendant).

## II. STANDARD OF DECISION

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009). A court may consider

exhibits attached to the complaint without converting the motion to one for summary judgment. Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 680-681 (6th Cir. 2011).

## III. ANALYSIS

### A. Statute of Limitations

It is well settled that § 1983 claims, such as those brought by Plaintiff in Counts I and II, borrow the analogous state-law statute of limitations for personal injuries. See Owens v. Okure, 488 U.S. 235, 240 (1989). Defendants argue that, by operation of Michigan's applicable three-year (and thirty-day) statute of limitations, Plaintiff's complaint was untimely as to any conduct occurring before May 20, 2013, which is three years and thirty days prior to Majors's death.[2] Defs. Br. at 6-7. All of Gerlach's alleged wrongful conduct, and some of Kakani's and LaNore's alleged wrongful conduct, occurred before this date.[3]

---

[2] Although a three-year statute of limitations generally applies to § 1983 claims based upon conduct that occurred in Michigan, the additional thirty-day period conceded by Defendants stems from Mich. Comp. Laws § 600.5852(1), which provides:

> If a person dies before the period of limitations has run <u>or within 30 days after the period of limitations has run</u>, an action that survives by law may be commenced by the personal representative of the deceased person at any time within 2 years after letters of authority are issued although the period of limitations has run.

(emphasis added); see also Defs. Br. at 6. Thus, if the decedent suffered an injury on a date three years and thirty days before his death, his death would have been "within 30 days after the period of limitations has run" as to that day's injury. Accordingly, subsequent suit by the representative would be timely as to that day's injury for two years following issuance of her appointment as representative.

[3] As alleged in the amended complaint, the involvement of Gerlach, who was the medical director and site physician at the Ionia, Michigan facility, ceased in December 2012, when decedent was transferred to a different correctional facility in Adrian, Michigan. See Am. Compl. ¶¶ 3, 28. The alleged involvement of Kakani, who treated decedent at the Adrian, Michigan, facility, began in December 2012 and ceased on September 5, 2014. Id. ¶ 32. And the alleged involvement of LaNore began on January 11, 2013 and ceased on September 5, 2014. Id. ¶ 32; see also Defs. Br. at 6-7.

4

The parties agree that a federal-law "discovery rule" governs when a limitations period begins to run. See Pl. Resp. at 8-9; Defs. Reply at 2.[4] They disagree, however, as to whose discovery of the claim is relevant: is it the decedent's discovery, or his representative's? It is often stated that, under federal law, the limitations period begins to run "when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." Cooey v. Strickland, 479 F.3d 412, 416 (6th Cir. 2007) (emphasis added). In this survivorship action, however, the "plaintiff" technically is the decedent's representative.

The parties point to no federal authorities that resolve this quandary. The cases each cites are distinguishable.

Defendants proceed on the assumption that the limitations period began running upon the decedent's knowledge of his own injury. See Defs. Reply at 4 ("Mr. Majors knew or should have known that potential claims were accruing as early as March 2010."). Defendants offer a case in which the claim of a plaintiff-inmate — who did not die — accrued on the date he was assaulted, because that is when he gained knowledge of the injury. See Davis v. Ludwick, No. 13-CV-12536, 2015 WL 1728390, at *4 (E.D. Mich. Apr. 15, 2015) ("On this date, it is alleged that Plaintiff's injury occurred when other inmates assaulted him. The event should have alerted Plaintiff to protect his right to file an action because the assault constituted the act providing the basis of his injury.").[5]

---

[4] Defendants initially cited Michigan law to show when the limitations period begins to run; their reply, however, concedes that federal law governs. See also Wallace v. Kato, 549 U.S. 384, 388 (2007) (the date that the limitations period was triggered is a question of federal law). Accordingly, Defendants' opening brief was of no value to this Court's analysis.

[5] Defendants also speculate that, even if the date of Plaintiff's discovery — as opposed to decedent's discovery — controls, this Court should assume that Plaintiff "should have known that potential claims of deliberate indifference were accruing if [decedent's family] had any communications with Mr. Majors at all . . . ." Defs. Reply at 4. This kind of factual speculation,

5

Plaintiff, on the other hand, argues that, although Majors "formally requested and paid for the production of [Majors's medical] documents on October 3, 2014," Plaintiff herself — i.e., the decedent's representative — did not receive the pertinent copies of Majors's medical records from MDOC until May 17, 2016. See Pl. Resp. at 11. "It was this event — the [representative's] receipt of the prison medical records — that triggered the limitations period," according to Plaintiff. Id.

Plaintiff relies heavily on Ruiz-Bueno v. Maxim HealthCare Services, 659 F. App'x 830 (6th Cir. 2016). In that case, the parties disputed whether the limitations period began as soon as the plaintiffs realized that wrongdoing occurred (when the results of an internal investigation became public), or if the period did not begin to run until the plaintiffs learned who committed the wrongdoing. Id. at 834. Either way, it was some piece of knowledge of the decedent's representative that controlled. Apparently, however, no defendant in Ruiz-Bueno argued that the decedent — who had a mental illness and died less than a month after admission to the jail — should have brought suit himself to protect his rights regarding the medication that could have saved his life. Thus, the issue at bar was not before the court in that case, and it does not control here. Cf. Dep't of Labor & Indus. v. Estate of MacMillan, 814 P.2d 194, 198 (Wash. 1991) (granting decedent's representative use of discovery rule as to representative's own discovery, but neither decedent nor representative knew the cause of injury during decedent's lifetime).

Although there does not appear to be clear Sixth Circuit authority on this point, it is clear to this Court that it would be a perversion of the discovery rule to permit the decedent's representative a "fresh start" at the statute of limitations when the decedent himself apparently had immediate notice of all facts necessary to bring a lawsuit, including the cause, effect, and

---

which assumes a certain minimum level of communication between family members, has no place in a motion for summary judgment. Additionally, it obviously is not true of all families.

perpetrators of the alleged wrongful conduct. Unlike in a wrongful death action, in a survivorship action, the plaintiff steps into the shoes of the decedent to bring claims that the decedent could have brought but for his death. White v. Johns-Manville Corp., 693 P.2d 687, 695 (Wash. 1985). Generally, "the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." Collyer v. Darling, 98 F.3d 211, 220 (6th Cir. 1996); see also Sawtell v. E.I. du Pont de Nemours & Co., 22 F.3d 248, 251 (10th Cir. 1994) ("[T]he cause of action begins to accrue when the injured person knew, or by the exercise of reasonable diligence should have discovered, the defect or the cause of the injury."). The discovery rule, when applicable to a decedent's representative, merely gives the representative the benefit of the same discovery rule that the decedent would be entitled to, had he lived. See White, 693 P.2d at 696-697 ("The statute of limitation pertinent to a survival action commences at the earliest time at which the decedent or his personal representatives knew, or should have known, the causal relationship between the decedent's exposure to asbestos and his ensuing disease." (emphasis added)) (citing Eisenmann v. Cantor Bros., Inc., 567 F. Supp. 1347 (N.D. Ill. 1983) ("A survivor takes the rights of the decedent — no more and no less. Therefore if the decedent would have had a cause of action during his lifetime, but for the invidious nature of his disease and his inability to link the injury to the wrongdoer, then that cause of action, when discovered, should survive his death." (emphasis added))); Christ v. Exxon Mobil Corp., 866 N.W.2d 602, 615 (Wis. 2015) ("Survival claims accrue on the date the injury is discovered or with reasonable diligence should be discovered by either the decedent or an appropriate third party (often the decedent's personal representative), whichever occurs first." (emphasis added)); Georgia-Pac. Corp. v. Benjamin, 904 A.2d 511, 515 (Md. 2006) ("[W]e hold that in a survival action, if the decedent's knowledge

7

is sufficient to satisfy the discovery rule, the decedent's knowledge is enough to trigger the running of the limitations period for the survival action.").

One Texas case is particularly clear that, in deciding whether a decedent's representative should be able to refer to her own discovery in applying the discovery rule, courts should look to the decedent's own knowledge:

> Finally, Dr. Slade argues that this case will be controlled by the eventual decision of the supreme court in [Russell v. Ingersoll-Rand Co., 795 S.W.2d 243 (Tex. App. 1990), aff'd, 841 S.W.2d 343 (Tex. 1992)]. We disagree. In Russell it was established that the deceased knew he had a cause of action against the defendant approximately six years before his death, yet he chose not to sue the defendant. After the deceased's death, his widow filed a wrongful-death claim against the defendant. The court of appeals held that the wife's wrongful-death action was barred by limitations because, if he were alive, a suit by the deceased would be barred. Unlike Russell, a question of fact exists in the present case concerning when the Gandaras or their daughter first knew a cause of action existed against Dr. Slade; therefore, it has not been established as a matter of law, as it was in Russell, that the deceased daughter, if alive, would be barred from bringing a cause of action against Dr. Slade.

Gandara v. Slade, 832 S.W.2d 164, 168 (Tex. Ct. App. 1992).

In cases where the statute is deemed to begin running upon the decedent's representative's knowledge of the injury, there was no opportunity for the decedent himself to appreciate the injury and bring suit. See, e.g., Ruiz-Bueno, 659 F. App'x at 834. Here, on the other hand, the amended complaint reflects the decedent's full knowledge of his condition, his desired treatment, the fact that his desired treatment was not forthcoming, and his physical deterioration.

Accordingly, this Court dismisses with prejudice claims arising out of injuries that occurred before May 20, 2013. This includes all conduct alleged with respect to Gerlach, who is

8

dismissed. A separate order to show cause will enter concerning those Defendants who might benefit from this result but did not join in the motion to dismiss.

**B. Wrongful Death and Michigan's Pre-Filing Requirements**

Defendants argue that Plaintiff's wrongful death claim is, in fact, a medical-malpractice claim; as a result, they argue that the claim should be dismissed, because Plaintiff did not comply with Michigan's pre-filing requirements for a medical malpractice claim. This argument fails at this pleading stage, because the wrongful death claim alleged here is not premised on a medical malpractice theory; rather it is premised on constitutional violations — which makes non-compliance with the medical malpractice pre-filing requirements irrelevant. Later factual development may show that Plaintiff's claim is unavoidably premised on a malpractice theory if in fact Defendants' medical judgments are inextricably intertwined with the constitutional violations. But at this stage, without the benefit of full factual development, dismissal is not appropriate.

In Michigan, a plaintiff may not commence a medical malpractice action without giving the would-be defendant notice of the action "not less than 182 days before the action is commenced." Mich. Comp. Laws § 600.2912b(1). Furthermore, the plaintiff also must attach to the medical malpractice complaint an "affidavit of merit," in which a health professional — "who the plaintiff's attorney reasonably believes meets the requirements for an expert witness" — states, among other things, his opinion that the conduct at issue breached the applicable standard of care. See Mich. Comp. Laws § 600.2912d.

It is undisputed that the instant complaint did not comply with these requirements. It is also undisputed that the remedy for failing to comply with these requirements, when they apply, is dismissal. Plaintiff argues, however, that the requirements do not apply, because the wrongful

9

death action — which appears in Count III of the amended complaint and is based upon the Eighth Amendment violations alleged in Counts I and II — is not a "medical malpractice" action. The Court agrees that dismissal is not currently appropriate.

Defendants state that, to determine whether a claim sounds in medical malpractice, this Court must look to substance, not form; it should discern "[t]he gravamen of an action . . . by reading the claim as a whole and looking beyond the procedural labels to determine the exact nature of the claim." Defs. Reply at 2 (quoting Tipton v William Beaumont Hosp., 697 N.W. 2d 552, 556 (Mich. Ct. App. 2005)). Defendants state, conclusorily, that Count III alleges "wrongful tortious conduct that (1) arose in the course of a professional relationship and; (2) calls into question Defendants' medical judgment" — the substance of a medical malpractice claim. Id. If this case did turn on whether a particular medical treatment was appropriate, Defendants would be correct. Jenkins v. Patel, 684 N.W.2d 346, 350 (Mich. 2004) ("[T]he medical malpractice statute of limitations applies to wrongful death actions where the underlying claim is medical malpractice . . . . [W]hen the underlying claim is medical malpractice, the medical malpractice accrual statute applies to a wrongful death action." (emphases added)); Bryant v. Oakpointe Villa Nursing Ctr., 684 N.W.2d 864, 871 (Mich. 2004) (medical malpractice claim requires professional relationship and questioning of medical judgment).

But an accurate reading of the complaint shows that the gravamen of this action is not an attack on the medical judgment of Defendants. Plaintiff is not claiming that Defendants prescribed a treatment at variance with the applicable professional standard of care. Rather, the entire focus of the claim is Defendants' alleged unconstitutional indifference to decedent's suffering and disregard of his pleading for treatment. See Compl. ¶¶ 24, 26, 27, 30, 34. Looking at just the complaint, which this Court must do on a motion to dismiss, Albrecht, 617 F.3d at

10

893, Defendants have not shown that Plaintiff failed to plausibly allege a claim that is necessarily dependent on the questioning of Defendants' medical judgment. Nor have Defendants excluded the possibility that Plaintiff may be able to assert both indifference claims and medical malpractice claims. See Gibson v. Moskowitz, 523 F.3d 657, 667 (6th Cir. 2008) (deliberate-indifference claims and Michigan medical malpractice claims based upon the same conduct are not mutually exclusive, having different standards of proof and affording different sources of damages).

Because Defendants bear the burden on a motion to dismiss and have failed to carry it, the motion to dismiss Count III of the amended complaint is denied.

**C. Motion to Transfer Venue**

Defendants move for transfer of this case to the Western District of Michigan under 28 U.S.C. § 1404, which governs so-called "permissive transfers" of venue. Their argument presupposes that their statute-of-limitations argument will be successful. See, e.g., Defs. Br. at 13.

Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.[6]

A court considering a § 1404(a) motion must "evaluate both the convenience of the parties and various public-interest considerations." Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 581 (2013). Specifically, the factors to be considered by the Court in ruling on a § 1404(a) motion are: (i) the convenience of the parties, (ii) the convenience of the witnesses, (iii) the relative ease of access to sources of proof, (iv) the availability of process to

---

[6] Plaintiff does not dispute that this action could have been brought in the transferee district.

compel attendance of unwilling witnesses, (v) the cost of obtaining willing witnesses, (vi) the practical problems associated with trying the case most expeditiously and inexpensively, and (vii) the interests of justice. See Int'l Show Car Ass'n v. Am. Soc. of Composers, Authors & Publishers, 806 F. Supp. 1308, 1310 (E.D. Mich. 1992).

It is Defendants' burden to show that transfer is warranted. See Moore v. Rohm & Haas Co., 446 F.3d 643, 647 (6th Cir. 2006) (citing 15 Wright & Miller, Fed. Practice & Proc. §§ 3844, 3847-3848 (2d ed. 2005)). Transfer should not occur when the effect is merely to shift the inconvenience from one party to another. Sullivan v. Tribley, 602 F. Supp. 2d 795, 800 (E.D. Mich. 2009).

Defendants argue that the alleged wrongdoing occurred "primarily" in the Western District. See Defs. Br. at 9. Given this Court's dismissal of all claims concerning wrongdoing that occurred before May 20, 2013, this is false; Majors was housed in an Adrian, Michigan facility, located within the Eastern District, from that date until July 2014 (a period of about 13-14 months), at which point he was transferred to a facility in the Western District. See Am. Compl. ¶¶ 28, 31. Defendants' alleged wrongdoing only continued in the Western District for a few months, until September or October 2014, at which time Majors began receiving the evaluation and treatment that he had requested, see Am. Compl. ¶¶ 35-36. And, even after Majors transferred from the Eastern to the Western District facility, he continued to complain to officials located in the Eastern District. See id. ¶ 32.

Defendants also address convenience to the non-party witnesses, as well as the parties' ability to compel the attendance of unwilling witnesses — some of whom allegedly are in Minnesota, where Majors was incarcerated before his time with MDOC. See Defs. Br. at 10-11. Defendants concede that, to have witness-related concerns considered, they bear the burden to

identify the witnesses and the substance of their testimony. See id. at 10. Defendants' briefs do not identify Minnesota witnesses (although there are some identified in their initial disclosures); and their reply cherry-picks some witnesses from the Western District, see Defs. Reply at 6-7, despite the fact that their initial disclosures also list witnesses located in the Eastern District and some whose residences are not identified, see generally Defs. Init. Disclosures, Ex. C to Defs. Reply (Dkt. 35-3). Concerning the parties themselves, Defendants only assert that six out of twelve parties (not including Gerlach) reside in the Western District. See Defs. Reply at 6.

Another infirmity in Defendants' argument is their exclusive focus on distances to the respective courthouses; they decline to discuss the effect that locations and distances will have on things like depositions.

One other factor is the 100-mile limit on this Court's ability to compel the attendance of witnesses. See Defs. Br. at 11 (citing Fed. R. Civ. P. 45(c)). Defendants raise this issue vis-à-vis the Minnesota witnesses. Id. ("The subjects of their testimony are Decedent's medical care while incarcerated with the Minnesota Department of Corrections. Importantly, this Court cannot subpoena these individuals who live more than 100 miles away from Detroit . . . ."). As Plaintiff points out, however, both the Eastern and Western District courthouses are over 100 miles from the Minnesota border, making this argument moot. See Pl. Resp. at 16.

This case simply is not a candidate for § 1404 transfer of venue. Although the other forum may be convenient and appropriate, it is not more convenient and more appropriate under the relevant factors and standard. Defendants bear the burden, yet they made no effort to discuss all of the controlling factors, such as the interests of justice (including, e.g., the case load of the transferee court) or access to all proofs, other than in-person testimony or those located in the Western District. Given the great weight afforded to a plaintiff's choice of forum, and the fact

13

that increased convenience to some would be offset, at least in part, by greater inconvenience to others, this portion of the motion is denied.

## IV. CONCLUSION

For the reasons stated above, the motion to dismiss filed by Defendants Gerlach, Kakani, and LaNore (Dkt. 29), and joined by Defendant Vives (Dkt. 30), is granted in part and denied in part.

SO ORDERED.

Dated: August 18, 2017                     s/Mark A. Goldsmith
     Detroit, Michigan               MARK A. GOLDSMITH
                                                      United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 18, 2017.

                                                                                  s/Karri Sandusky
                                                                                  Case Manager