UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF RICHIE MAJORS,
et al.,

           Plaintiffs,                    Case No. 16-cv-13672
                                            Hon. Mark A. Goldsmith

vs.

ROGER A. GERLACH, et al.,

           Defendants.
_____/

## OPINION & ORDER
## GRANTING CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 113) AND GRANTING MDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 145)

This case concerns the medical treatment of Richie Majors, a.k.a. James Fullove, while Majors was in the custody of the Michigan Department of Corrections ("MDOC"). Defendants Thomas LaNore and Savithri Kakani (together, the "Corizon Defendants") and Defendants John Solomonson, Karen Rich, Joel Evertsen, and Dorinda Blohm (collectively, the "MDOC Defendants") have filed for summary judgment on Eighth Amendment and wrongful death claims brought by Majors' sister and the representative of his estate, Plaintiff Re'Shane Lonzo (Dkts. 113, 145). Both motions have been fully briefed. Because oral argument will not aid the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons that follow, the Court grants both motions.

## I.      BACKGROUND

Majors was diagnosed with multiple sclerosis ("MS") while an inmate at the Minnesota Department of Corrections in 2005. Corizon Defs. Statement of Material Facts ("SMF") ¶ 2 (Dkt. 113). Majors was released from Minnesota DOC custody in February 2008, id. ¶ 5, and entered MDOC custody in March 2010, id. ¶ 7. He passed away on June 19, 2016. Id. ¶ 44.

1

Majors' medical records from the Minnesota Department of Corrections contain many references to his MS diagnosis. On June 6, 2005, Majors' doctor wrote that Majors was "most likely" in remission, and that he did not believe that Majors needed to be on any medications at that time. See Minnesota Medical Records, Ex. A to Corizon Defs. Mot., at PageID.1448 (Dkt. 117). By August 1, 2005, however, his doctor observed that his multiple sclerosis was acting up. Id. at PageID.1447. The following April, his doctor noted that Majors "had been good for the last few months," but recently had had pain and fell twice. Id. at PageID.1440. Shortly before his release from Minnesota DOC custody in February 2008, Majors was taking Rebif twice a week. Id. at PageID.1433.

The parties dispute whether Majors treated his MS after he was released from Minnesota Department of Corrections custody in 2008, but before he was placed in MDOC custody in 2010. The record is admittedly unclear on this point. See MDOC Medical Records, Ex. C to Corizon Defs. Mot., at 29 (Dkt. 119) (August 12, 2014 note that "He did not treat his MS after his release in Minnesota"); Add'l MDOC Records, Ex. F to Pl. Resp. to Corizon Defs. Mot., at PageID.2101 (Dkt. 141-6) (August 18, 2011 note which states that Majors "[h]as been w/o meds for MS for approx. 3 yrs."); PageID.2100 ("treatment plan" note, which states that Majors "was taking Interferon until 2008 and quit because his insurance did not cover it"); but see MDOC Medical Records at 89 (September 26, 2014 note which states that "Patient states took injections in the world").

Majors arrived at the MDOC Charles Egeler Reception and Guidance Center on March 31, 2010. SMF ¶ 7. Intake forms from this time period note Majors' MS diagnosis. See Wayne County Jail Medical Records, Ex. E to Pl. Resp. to Corizon Defs. Mot. (Dkt. 141-5) (form states that he has multiple sclerosis and was taking Interferon, but had not had medication for three months); Add'l MDOC Records at PageID.2105 (Dkt. 141-6) (April 1, 2010 intake form says that

Majors was diagnosed with MS in 1993, but was currently symptom-free and stable). A report from April 16, 2010 indicates that Majors had written two kites to medical since his arrival; however, the document indicates that this was due to having smaller shoes and having an injury to his left Achilles tendon. Id. at PageID.2102. Majors also said at that time that he needed a cane to assist with walking, due to unsteadiness from his MS diagnosis. Id.

**Gus Harrison Correctional Facility – Interactions with Defendants Kakani and Solomonson**

Majors' MDOC incarceration from 2010 until late 2012 is not relevant for the purposes of the instant motions.[1] Majors arrived at Gus Harrison Correctional Facility, where Defendants Kakani and Solomonson worked, on November 29, 2012. SMF ¶ 8; Solomonson Aff., Ex. B to MDOC Defs. Mot., ¶ 2 (Dkt. 145-3). Kakani was employed as a physician's assistant ("PA"); Solomonson worked as a registered nurse.

A January 11, 2013 case management form notes that Majors "states that he is not receiving services from HC [healthcare] about his MS. He is managing the best he can." 2d Add'l MDOC Records, Ex. G to Pl. Resp. to Corizon Defs. Mot., at PageID.2192 (Dkt. 141-7). The author of this note is unclear from the record. A February 26, 2013 note says that Majors "reports signs and symptoms consistent with MS, which is a medical condition. . . . Inmate was advised to kite healthcare for his sign and symptoms with his MS." Id. at PageID.2190. However, a case management form from March 15, 2013 states that although Majors said that he was "not receiving services from HC about his MS, he has not initiated any services." Id. at PageID.2189. The form further states that Majors "use[d] to get shoots [sic] for medication before but has not had any since he's been incarcerated. He is managing the best he can." Id.

---

[1] This Court previously held that the statue of limitations had expired as to all claims arising out of injuries that occurred before May 20, 2013, which included all conduct alleged with respect to Defendants Roger Gerlach, Robert Prevo, and Heidi Smith. 8/18/2017 Op. & Order (Dkt. 39); 12/26/2017 Op. & Order (Dkt. 69).

Majors first saw PA Kakani for a chronic care visit on May 21, 2013. MDOC Medical Records at 10. She noted that Majors was diagnosed with MS in 2005, but that he "said he feels good no issues," was "not on any meds at this time" and "looks like in remission[.]" Id. at 10-11. Kakani wrote as follow-up that she would "review mri reports and consult notes from minnasota [sic]." Id. at 11. There is no indication in the record that Kakani did so. After this visit, there does not appear to have been any interaction between Kakani and Majors for about a year.[2]

In April and May of 2014, Majors began sending kites complaining of his MS. MDOC Medical Records at 12-14, 16. Majors sent a kite on April 21, 2014 saying that he has MS, that he was starting to have problems walking, and that he had no medication to stop a relapse. Id. at 12. The kite was received by Solomonson, who commented, "Thank you for this information." Id. Majors sent another kite on April 24, 2014, which also complained of his MS and stated that he wanted medication. Id. at 13. This kite was also received by Solomonson; the comment was that Major's request for medication would be passed along to the MP. Id. On May 4, 2014, Majors sent a kite saying that he wanted Interferon beta 1a for his MS. Id. at 14. Solomonson's response was that Majors' request had been sent to the MP twice, and "if they chose to set up appt the MP will set this up. Continuing to kite will not make this process faster." Id.

On May 21, 2014, Kakani reviewed Majors' chart, noted that he was requesting medication, and ordered a follow-up appointment for him on May 29, 2014. Id. at 15. On May 22, 2014, Solomonson processed another kite from Majors, where Majors asked when his appointment with the MP would take place. Id. at 16. Solomonson commented that Majors had

---

[2] A Qualified Mental Health Professional Evaluation from June 21, 2013, apparently performed by a medical professional who is not a defendant in this case, reflects that he "was diagnosed with MS in 2005 which has presented a significant loss of functioning for him emotionally and physically. He easily tires, has difficulty walking and feels that his memory has significantly deteriorated due to the MS." 2d Add'l MDOC Records at PageID.2176.

an appointment set up for the end of next week.  Id.  This was the last contact Solomonson had with Majors.

Majors saw Kakani for a chronic care visit on May 30, 2014.  Id. at 17.  Majors told Kakani that he was diagnosed with MS and was "on the injections" in the past, but was not on any medication at this time.  Id.  Kakani wrote that "he said he just want[s] us to know about it[.]"  Id.  Majors denied any gastrointestinal, genitourinary, cardiac, pulmonary, or neurology symptoms.  Id.  Kakani ordered an optometry visit and another chronic care visit.  Id. at 18; Kakani Aff., Ex. D to Corizon Defs. Mot., ¶ 8 (Dkt. 113-4).  She also noted that there were no medical records available to review Majors' diagnosis.  MDOC Medical Records at 18.

On June 11, 2014, Kakani reviewed Majors' chart, and noted that she consulted with a physician regarding Majors not taking any medications.  Id. at 20; Kakani Aff. ¶ 9.  This was Kakani's last involvement with Majors.  Kakani Aff. ¶ 10.

### West Shoreline Correctional Facility – Defendants LaNore, Rich, Evertsen, and Blohm

Majors was transferred to West Shoreline Correctional Facility on July 15, 2014.  MDOC Medical Records at 21.  LaNore worked as a PA at this facility; Evertsen, Rich, and Blohm all worked as registered nurses.  Majors' Intrasystem Transfer Summary, dated July 9, 2014, contains several references to multiple sclerosis: an 8/18/2011 entry says, "MSP Sick Call: Worsening MS. Would like Rx injections back for MS," a 2/17/2012 note reads, "Chart Review/Update: May be having symptoms of MS.  See note 2/17/12," and an 11/18/2012 entry reads, "Nurse Sick Call: RNR: MS s/s worsening."  2d Add'l MDOC Records at PageID.2123-2124.

Majors began to complain of his MS symptoms upon his arrival to West Shoreline Correctional Facility.  He sent a kite on July 23, 2014, complaining that he had not received any treatment, medicine, or attention to slow the process of his MS since being in MDOC custody.  Rich responded that she would "followup with chart review and appointment."  Id. at PageID.2122.

On August 8, 2014, Majors kited saying that he would like a follow-up meeting about his MS. MDOC Medical Records at 23. Evertsen processed the kite and said that Majors would be scheduled with nursing. Id.

Majors then sent another kite on August 9, 2014, saying that this was his third request for medical assistance with the "severe pain" he was experiencing. Id. at 24. "Someone's immedicate [sic] attention and or compassion to my request and health will be greatly appreciated." Id. Blohm processed the kite and commented that Majors was scheduled with nursing. Id.

On August 10, 2014, Blohm completed a nurse protocol for Majors. Id. at 25. She wrote that Majors told her that he was put on Interferon but never took the dose because he lived in a halfway house and they threw out his injections. Id. at 25-26. Majors told Blohm that he "uses the wall in the units to walk;" Blohm commented that his gait was slow, he dragged his left foot, and his face drooped on the left. Id. at 25. She also noted that he was unable to stand on one foot without swaying and his speech was slurred. Id. at 26. She referred him to a medical provider – either a physician, a nurse practitioner, or a physician's assistant – for further treatment. Id.; Blohm Aff., Ex. F to MDOC Defs. Mot., ¶ 7 (Dkt. 145-7).

Majors then saw PA LaNore on August 12, 2014. LaNore Aff., Ex. E to Corizon Defs. Mot., ¶ 3 (Dkt. 113-5). LaNore commented that Majors was doing "fair" and had "MS like presentation." MDOC Medical Records at 30. LaNore wrote that Majors "has not experienced much changes [sic] with his MS." Id. at 29. LaNore noted that treatment would require approval from the Acting Chief Medical Officer ("ACMO"). Id. at 30.

On August 15, 2014, LaNore entered several comments on Majors' chart. He wrote that Majors "was Dx [diagnosed], apparently, with MS in 2005. His MS was to have been Dx with MRI and cerbralspinal fluid assay. He was referred to neurology . . . [t]he neurologist question [sic] the validity of the MS Dx." Id. at 34. LaNore wrote that Majors' "MS remained stable and

was treated with Rebif . . . injections 2 times weekly while incarcerated in Minnesota." Id.  LaNore observed that there were no records available regarding an "MRI Brain, Cspine or Tspine."  Id. An MS diagnosis could not be confirmed without these records, LaNore wrote, so he would order another records release form for Majors to complete.  Id.[3]

The next day, Evertsen processed a kite from Majors where Majors stated that he had trouble sleeping at night.  Id. at 36.  Majors asked whether there was any medication available for him to be able to sleep at night, and said that he was seeking "urgent assistance."  Id.  Evertsen responded that he was unsure of how to help Majors without knowing more about his symptoms, but said that this sounded like a mental health issue, not a medical one.  Id.  Evertsen forwarded the request to mental health.  Id.

Majors was brought to see Evertsen on August 21, 2014, after Majors was found sleeping on a bench outside.  Id. at 37.  Evertsen noted that Majors had a "very unsteady gait," and Majors was given a walker.  Id.

On August 24, 2014, Blohm saw Majors after he became lightheaded when taking a shower.  Id. at 43.  She noted that Majors had an "unequal smile" and slurred speech, but said that this was normal for him.  Id. at 42.  Blohm said that she discussed with Majors the possibility that he would need to be transferred to a different housing unit so that he could use a shower chair.  Id. She noted that his gait was unsteady, and that he had been pushed in a wheelchair by another inmate.  Id. at 43.

On September 2, 2014, Evertsen gave Majors a wheelchair "for distance only" and encouraged him to continue to use the walker in his housing unit.  Id. at 54.  Evertsen discussed Majors' case with LaNore.  Id.; LaNore Aff. ¶ 6.

_____

[3] On August 27, 2014, Majors visited a doctor who noted in Majors' chart that the medical records from Minnesota were still pending.  MDOC Medical Records at 50.

Blohm saw Majors on September 5, 2014, at which time Majors told her he was concerned that he was not having treatment for the MS. MDOC Medical Records at 57. He asked for treatment. Id. She again noted his "unsteady" gait, asymmetrical smile, and drooping on the left side of his face. Id. Majors was given "30cc MOM" – presumably, "milk of magnesia" – to treat constipation and was instructed to increase fluids, fruits, and vegetables. He was told that healthcare was awaiting the testing that had been done leading up to his diagnosis.

On September 8, 2014, Blohm saw Majors again; she informed him that he would have a chart review in the next few weeks once additional documentation was received from the other hospitals and prisons. Id. at 60.

LaNore received a response from Hennepin County Medical Center regarding Majors' request for a release of records from February to December of 2005 on September 12, 2014. Id. at 63. Hennepin County Medical Center did not have any relevant records. Id. LaNore wrote in Majors' chart that he might have "custody" observe Majors unknowingly and may require testing to confirm the diagnosis of multiple sclerosis. Id.

Less than a week later, on September 18, 2014, LaNore spoke with Corizon's utilization management director, Dr. Keith Papendick. Id. at 68; LaNore Aff. ¶ 8. Dr. Papendick orally approved an MRI for Majors. MDOC Medical Records at 68; LaNore Aff. ¶ 8. LaNore submitted the "407" (consultation request) and received written approval the same day. LaNore Aff. ¶ 8. The record from this day also says that Majors was "[i]ncarcerated into MI facilities and Tx [treatment] was with intermittent prednisone. There were orders for repeat MRI and LP [lumbar puncture] by the Dr." MDOC Medical Records at 70.

Majors saw Rich on September 18, 2014 to check up on results from the magnesium citrate that he was given for constipation. Id. at 67. She noted his "slow, steady gait." Id.

The next day, Majors visted LaNore, who noted that Majors was scheduled for an MRI of his brain and spine on September 29.  Id. at 78.  LaNore noted that Majors had a history of bi-weekly injections of Rebif while incarcerated in Minnesota, and stated he may elect to retreat in this manner.  Id.  Blohm noted this same day that Majors told her he was afraid of dying; she told him that treatment was awaiting the results from his testing later in the month.  Id. at 84.  Majors was reportedly relieved that his testing was moving forward.  Id.

On September 23, 2014, LaNore wrote that Majors' records lack supporting evidence for a diagnosis of MS.  Id. at 86.  He observed that Majors had been given approval for an MRI, and that LaNore would await the results for additional therapy or consultations.  Id.

On September 26, 2014, Blohm saw Majors again; he felt dizzy and weak.  Id. at 89.  She notes that a "pusher" "is insisting that the patient is having a stroke."  Id.  Evertsen made a clinical progress note on this same day, noting that Majors had started a tapering dose of Prednisone on September 22.  Id. at 88.  Majors said that he was able to move a little better since starting the medication.  Id.

On October 1, 2014, Dr. Richard Worel made a note in Majors' chart that he had reviewed Majors' MRI and the findings were consistent with spinal cord and intracranial demyelinization. Id. at 94.  Dr. Worel wrote that he had discussed this with LaNore, and LaNore would address "with request for appropriate meds for MS."  Id.  LaNore documented this as well, and said that he would request Rebif for two-three times weekly.  Id. at 96.  He submitted the request for Rebif to the ACMO that same day.  LaNore Aff. ¶ 12.  The ACMO approved a different brand of Interferon beta-1a, Avonex, on October 2.  Id. ¶ 13.  The following day, LaNore ordered Avonex for Majors.  Id. ¶ 14. Majors began taking Avonex on October 7, 2014.  Id. ¶ 15; MDOC Medical Records at 107.

After this point, Majors began receiving weekly Avonex injections, typically from Blohm but sometimes from Evertsen. Majors' condition worsened, however, and he was eventually released on medical parole in 2016. Am. Compl. ¶ 41 (Dkt. 24). He lived in a nursing home facility until June 19, 2016, when he passed away from complications attributed to multiple sclerosis. Id. ¶ 42.

## II.     STANDARD OF DECISION

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th

Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## III.    ANALYSIS

Majors' sister, Re'Shane Lonzo, filed the instant suit against twelve defendants, six of whom remain in the case.  Lonzo brings her claim pursuant to 42 U.S.C. § 1983, arguing that Defendants' treatment of Majors amounts to deliberate indifference in violation of the Eighth Amendment.  She also brings a wrongful death claim pursuant to Michigan Compiled Laws § 600.2922.  The Court will address the § 1983 claim first.

To prevail on a § 1983 claim, a plaintiff must prove that "(1) the defendant was a person acting under the color of state law, and (2) the defendant deprived the plaintiff of rights, privileged, or immunities secured by the Constitution or laws of the United States."  Fridley v. Horrighs, 291 F.3d 867, 871-872 (6th Cir. 2002).  Here, there is no dispute that Defendants were acting under the color of state law.  The Court must therefore determine whether Defendants deprived Majors of a constitutional right.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs."  Blackmore v. Kalamazoo Cty., 390 F.3d 890, 895 (6th Cir. 2004) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  Because the Eighth Amendment does not prohibit an inadvertent failure to provide adequate medical care, a prison official can only be found liable under the Eighth Amendment if he or she "knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  Id.  Thus, a plaintiff must satisfy both an objective and subjective component.

The objective component requires that the deprivation alleged be "sufficiently serious." Farmer, 511 U.S. at 834. "[W]hen an inmate has a medical need diagnosed by a physician as mandating treatment, the plaintiff can establish the objective component by showing that the prison failed to provide treatment[.]" Rhinehart v. Scutt, 894 F.3d 721, 737 (6th Cir. 2018) (internal quotations omitted). "But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component . . . requires a showing of care so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. "There must be medical proof that the provided treatment was not an adequate medical treatment of the inmate's condition or pain." Id. (quotations and brackets omitted).

The subjective component requires a showing that prison officials have "a sufficiently culpable state of mind in denying medical care." Blackmore, 390 F.3d at 895 (quoting Brown v. Bargery, 207 F.3d 863, 867 (6th Cir. 2000)). "A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." Rhinehart, 894 F.3d at 738.

The MDOC Defendants have raised a defense of qualified immunity. MDOC Defs. Mot. at 11 (Dkt. 145). Once a defendant raises a qualified immunity defense, the plaintiff bears the burden of demonstrating that it does not apply. Rodriguez v. Passinault, 637 F.3d 675, 689 (6th Cir. 2011). To defeat a defense of qualified immunity, the plaintiff must satisfy the following two-part test: (i) the defendant violated a constitutional right, and (ii) the right at issue was "clearly established" at the time of the misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001) (overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009)). While the Court in Saucier mandated that the two steps be addressed in order, the Court in Pearson held that courts have discretion regarding which step to address first. Pearson, 555 U.S. at 236.

This Court will take the first prong of the qualified immunity inquiry first, and address whether any Defendant violated Majors' constitutional right. Because the circumstances surrounding each Defendant's care of Majors are different, the Court will first examine whether Defendants located at Gus Harrison Correctional Facility violated Majors' constitutional rights, then undergo the same inquiry for Defendants located at the West Shoreline Correctional Facility.

## A. Gus Harrison Correctional Facility

As an initial matter, the parties dispute which standard should be applied to the objective component of Majors' Eighth Amendment claim. Defendants and Lonzo both cite Blackmore v. Kalamazoo Cty., 390 F.3d 890 (6th Cir. 2004), but dispute which of the standards articulated in that case applies. In Blackmore, the plaintiff was booked in the Kalamazoo County Jail at 5:25 a.m. on Saturday, and began experiencing abdominal pain within an hour. Id. at 894. A jail log reflected that the plaintiff was complaining on Sunday; on Monday, he filed a request for medical care in which he requested medical attention "right away." On Monday morning, a nurse diagnosed him with appendicitis, and he was transported to a hospital for an appendectomy. The surgery was successful.

The district court granted summary judgment in defendants' favor, concluding that the plaintiff had not satisfied the objective factor because he had not offered any verifying medical evidence to show that he suffered a detriment from not having his surgery earlier. The Sixth Circuit reversed, explaining that "the 'verifying medical evidence' requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care," but this standard "does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." Blackmore, 390 F.3d at 898. The Sixth Circuit concluded that Blackmore's claim fell under the "obviousness" line of decisions, because he "exhibited obvious manifestations of

pain and injury." Id. at 899. "Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." Id.

Lonzo argues that Majors suffered from an objectively serious medical need – "one that has been diagnosed by a physician or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Perez v. Oakland Cty., 466 F.3d 416, 423 (6th Cir. 2006) (quoting Blackmore, 390 F.3d at 897). She points out that Majors' medical records show that he had been diagnosed with MS, and argues that other prisoners noticed his need for medical attention. Therefore, she says she need only show that his medical need was sufficiently serious. Pl. Resp. to Corizon Defs. Mot. at 17-18 (Dkt. 140). The Corizon Defendants argue that Lonzo must show that any delay in Majors' treatment, or inadequate treatment, caused him harm; because Lonzo does not have any expert witnesses, she has no means of attributing any alleged subsequent harm to his medical care in 2013 or 2014. Corizon Defs. Mot. at 11-12.

The Court finds that, in 2013, Majors' medical need was not objectively serious. Despite a previous diagnosis of MS, Kakani concluded that he was in remission. MDOC Medical Records at 11. There is no evidence that Majors kited regarding his MS for nearly a year after this point, i.e. until April 2014. See id. at 12. If Kakani believed him to be in remission, and Majors was not complaining about his pain, then this can be neither a situation where a physician diagnosed a condition mandating prompt treatment, nor where a lay person would recognize that Majors needed care. Because Majors' medical need in 2013 was non-obvious, Lonzo must put forth "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Santiago v. Ringle, 734 F.3d 585, 590 (6th Cir. 2013) (quoting Napier v. Madison Cty., 238 F.3d 739, 742 (6th Cir. 2001)). She has failed to do so. In fact, she has entirely failed

to submit a witness list – either for lay witnesses or for medical experts – and thus cannot present anyone at trial who would be able to testify about the detrimental effect of a delay in Majors' medical treatment. Accordingly, Lonzo has not satisfied the objective prong with respect to any of Kakani's conduct in 2013.

However, with respect to the conduct that occurred in 2014, the facts of this case do not easily fit within either the "obvious medical need" category of complaints, or the "minor maladies or non-obvious complaints of a serious need for medical care" framework. While Kakani stated that Majors was in remission during the time he was in her care, there is also evidence that Majors was complaining regularly of his pain, noting that he suffered from MS. See, e.g., 4/21/2014 kite ("Inmate says in kite that he has MS and his legs are starting to show problems walking. . . . He states that he has had no medication to stop MS relapse"); 4/24/2014 kite ("Inmate is complaining that he has multiple sclerosis and wants medications for it"); 5/4/2014 kite ("Inmate wants interferon beta 1A for his multiple sclerosis.").

There may well be an issue of fact regarding the obviousness of Majors' need for medical treatment in 2014, depending on whether a jury were to credit Kakani's statement that Majors "said he just want[ed] us to know about" his MS, or Majors' kites stating that he needed medication for his manifest symptoms. Rather than resolve that issue, the Court will assume that Lonzo could satisfy the objective prong of the Eighth Amendment inquiry under an "obvious medical need" rationale, and proceed to consider the subjective prong.

The subjective component "requires a plaintiff to prove that the doctors had a sufficiently culpable state of mind, equivalent to criminal recklessness," Santiago, 734 F.3d at 591, and is assessed individually for each defendant, Rhinehart, 894 F.3d at 738. An official is deliberately indifferent where he or she "(1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in fact draw the inference, and (3) then disregarded that risk." Santiago, 734

F.3d at 591 (internal quotations omitted).  The subjective component "must be addressed for each officer individually," <u>Rhinehart</u>, 894 F.3d at 743, so the Court will examine the subjective component with respect to both Kakani and Solomonson.

## 1. Savithri Kakani

Lonzo states that Kakani requested an MRI and a neurology consultation for Majors in 2013, but Majors did not receive either while he was in Kakani's care.  Pl. Resp. to Corizon Defs. Mot. at 21.  When she saw Majors again in 2014, she did not provide him with any medication or treatment despite his request for medication.  <u>Id.</u>  Lonzo argues that there is a genuine issue of fact as to whether Kakani could actually believe that Majors was in remission, and that a jury could conclude that her actions did not amount to a reasonable treatment plan.  <u>Id.</u> at 22.

As discussed, Lonzo has failed to show that Majors had an objectively serious medical need in 2013.  Lonzo has similarly failed to show that the subjective prong of the Eighth Amendment inquiry was satisfied as to Kakani's conduct in 2013.  In May 2013, Kakani did not subjectively perceive facts from which to infer substantial risk to Majors.  She noted his prior diagnosis of MS, but believed that he was in remission at that time.  While she failed to follow up on her request for the MRI report and neurology consult note, there is no reason to think that this amounts to deliberate indifference, as Kakani did not see any risk to Majors at the time.  In fact, Majors told her that he felt "good," and he did not complain about his MS for nearly a year after seeing Kakani.  The mere fact that Kakani sought a more complete medical record for her patient does not alone indicate that she perceived a substantial risk to his health.

In May 2014, Kakani saw Majors again following his complaints of MS.  She noted that he "stated that he just wanted health care to know about his condition and history," and that he denied having any symptoms.  Kakani Aff. ¶ 7.  She ordered an optometry visit and the next chronic care visit.  <u>Id.</u> ¶ 8.  In June 2014, she consulted with a physician regarding Majors'

medication, and documented no changed to his treatment plan. Id. ¶ 9. Thus, to the extent Kakani inferred a substantial risk to Majors at this point, she took steps to address that risk. She spoke with a doctor and concluded that Majors' treatment plan need not change. This is not a disregard of substantial risk to Majors. "A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." Rhinehart, 894 F.3d at 738. Even if, as Lonzo claims, Kakani was incorrect that Majors was in remission at this time, "[a] doctor's errors in medical judgment . . . do not suffice to establish deliberate indifference." Id. The Court finds that Lonzo cannot satisfy the subjective prong of the Eighth Amendment inquiry, and dismisses this claim against Kakani.

### 2. John Solomonson

As for Solomonson, Lonzo argues that he "did nothing" in response to Majors' April 21, 2014 kite stating that he had MS and that he was having problems walking. Pl. Resp. to MDOC Defs. Mot. at 17 (Dkt. 146). In response to the next kite – three days later – Solomonson passed along Majors' request for treatment to a medical provider. Majors kited again on May 4, to which Solomonson "chastise[d]" him for continuing to kite even though Majors' request had twice been sent to a medical provider. Id. Lonzo argues that a reasonable jury could find that Solomonson knew that Majors needed medical treatment, that he was not receiving it, and yet failed to take any action. Id. at 18.

The Court disagrees. Solomonson indicated that he would pass along Majors' concerns to a medical provider, which he did within three days of receiving Majors' initial kite. Solomonson, as an RN, could neither diagnose Majors' condition nor prescribe him medication. Solomonson Aff. ¶¶ 11-12. While Majors' kites indicate that he needs medical attention, there is no reason to think that he needed to immediately see a medical provider. Majors saw PA Kakani approximately one month after he first kited to Solomonson. Therefore, Solomonson's responses to Majors' kites

do not show disregard of substantial risk to Majors. Solomonson did not "<u>consciously</u> expos[e] the patient to an <u>excessive</u> risk of <u>serious</u> harm." <u>Rhinehart</u>, 894 F.3d at 738 (emphases in original).

Lonzo argues generally that the MDOC Defendants, as registered nurses, cannot merely "follow the chain of command," relying on <u>Hadix v. Caruso</u>, 461 F. Supp. 2d 574 (W.D. Mich. 2006). Pl. Resp. to MDOC Defs. Mot. at 20. But the conditions faced by prisoners in <u>Hadix</u> are a far cry from what Majors faced here. His condition did not obviously necessitate immediate treatment; it was not apparent to a registered nurse that defaulting to the judgment of a medical doctor or a physician's assistant, or requiring Majors to wait a short period of time before seeing a medical professional, would be a disregard of a substantial risk to Majors. Following the medical judgment of professionals in this case does not amount to deliberate indifference.

For these reasons, the Eighth Amendment claim against Solomonson is dismissed.

### B. West Shoreline Correctional Facility

By the time Majors arrived at West Shoreline Correctional Facility, his complaints regarding MS were more frequent. Majors repeatedly sent kites regarding his condition, where he asked for "immediate attention," <u>see</u> MDOC Records at 24 (8/9/2014 kite). When Blohm saw Majors on August 10, 2014, she noted Majors' slow gait, that he dragged the left foot, and that Majors' smile was uneven with a left-side droop. <u>Id.</u> at 25. Majors was unable to stand on one foot without swaying, and his speech was slurred. <u>Id.</u> at 26. LaNore noted on August 12, 2014 that Majors had an "MS like presentation," <u>id.</u> at 30; on August 21, Majors fell asleep outside and had trouble walking, <u>id.</u> at 37. Evertsen noted that Majors was "very unsteady on his feet" and gave Majors a wheeled walker. <u>Id.</u>

Viewing these facts in the light most favorable to the plaintiff, a jury could find that Majors' medical need, at this point, was "one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." Santiago, 734 F.3d at 590 (quoting Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008)). In such case, "the plaintiff can meet the objective prong by showing 'that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.'" Mattox v. Edelman, 851 F.3d 583, 598 (6th Cir. 2017) (quoting Blackmore, 390 F.3d at 900).

Majors saw nurses, physician's assistants, and doctors regularly after his arrival at West Shoreline Correctional Facility. He arrived in July, and then sent a "follow up" kite regarding a request for treatment on August 6. MDOC Medical Records at 23. He was seen by medical providers five times in August, including once by an MD and once by a PA. Id. at 25, 29, 37, 42, 46. He saw a nurse on five occasions in September, id. at 54, 57, 60, 64, 67, before LaNore ordered an MRI for Majors on September 18, id. at 70. From Majors' arrival on July 15 until his first Avonex injection on October 7, medical providers at West Shoreline addressed Majors' questions; provided him with medications, a walker, and a wheelchair to ease his ailments; sought medical records from other facilities; performed their own tests, and ultimately approved his treatment plan. Thus, while it may have been obvious that Majors needed medical treatment, Lonzo has failed to show that this need was not addressed within a reasonable time frame.

Further, even assuming Lonzo could satisfy the objective component as to the Defendants at West Shoreline, a plaintiff must not only show sufficient harm, but also that the defendants acted with deliberate indifference. As noted above, this subjective component "requires a plaintiff to prove that the doctors had a sufficiently culpable state of mind, equivalent to criminal recklessness," Santiago, 734 F.3d at 591, and is assessed individually for each defendant, Rhinehart, 894 F.3d at 738. An official is deliberately indifferent where he or she "(1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in fact draw the inference, and (3) then disregarded that risk." Santiago, 734 F.3d at 591 (internal quotations

omitted). The Court will examine the subjective component with respect to each Defendant who treated Majors at the West Shoreline Correctional Facility.

### 1. Thomas LaNore

LaNore first saw Majors on August 12, 2014. Three days later, he noted that he needed to confirm the MS diagnosis. By September 12, LaNore had received a response from Hennepin County Medical Center regarding Majors' request for a release of records, and learned that Hennepin County did not have any records. Six days later, LaNore sought and obtained permission for an MRI. On September 23, LaNore wrote that Majors' "records lack supporting evidence for the Dx of MS," while still noting that Majors had a history of treatment in Minnesota with biweekly Rebif injections. MDOC Records at 86. The results of the MRI confirmed the MS diagnosis, and October 1, LaNore requested Rebif for Majors. Majors began taking Avonex injections on October 7, 2014.

LaNore argues that, in his medical judgment, he believed it necessary to obtain medical records confirming Majors' diagnosis before obtaining approval for Majors' medication. Corizon Defs. Mot. at 14. He contends that this is not a case where the treatment was so cursory as to amount to no treatment at all, and thus LaNore's medical judgment was appropriate. Id. at 15. Lonzo counters that (1) LaNore's own records show that he knew there was a previous MRI request, so LaNore showed deliberate indifference by either disregarding this prior request or not fully reading Majors' medical files until September 18, 2014; (2) LaNore only prescribed treatment when Lonzo herself began complaining to the warden about the lack of medical care; and (3) the treatment that Majors was prescribed was the same that he received when at Minnesota Department of Corrections. Pl. Resp. to Corizon Defs. Mot. at 23-24.

Lonzo contends that the month-long delay in confirming the MS diagnosis – presumably from August 12 until September 18 – was unreasonable and unconstitutional. Based on her first

argument, she seems to think that LaNore should have realized the first day he saw Majors that an MRI had been previously requested, and requested the MRI at that time, instead of waiting for the records from Minnesota.

"On summary judgment, [a plaintiff] may not simply point to a delay and argue that a jury might not believe the doctor's explanation; he must put forth some additional evidence of deliberate indifference, since ultimately he has the burden of proof at trial." Santiago, 734 F.3d at 593. Lonzo points only to a supposed delay and offers no additional evidence of LaNore's deliberate indifference. She claims that her complaints to the warden motivated LaNore to obtain medication for Majors, but there is no evidence that LaNore ever learned of Lonzo's complaints. Lonzo does not explain how LaNore's decision to confirm his patient's diagnosis before beginning a treatment plan shows that he had a sufficiently culpable state of mind.[4] Indeed, it seems that proceeding with a treatment plan for MS when the medical provider had not even confirmed such a diagnosis could itself be considered criminally reckless behavior.

LaNore repeatedly followed up with Majors' care and ensured that he received the appropriate testing and medication. "[W]hen a claimant challenges the adequacy of an inmate's treatment, 'this Court is deferential to the judgments of medical professionals.'" Rhinehart, 894 F.3d at 738 (quoting Richmond v. Huq, 885 F.3d 928, 940 (6th Cir. 2018)). The Court declines to find that LaNore's actions constitute a deliberate indifference toward Majors' serious medical needs. The § 1983 claim against LaNore is dismissed.

---

[4] Lonzo also references "Corizon's policy to deny requests for outside treatment 99% of the time." Pl. Resp. to Corizon Defs. Mot. at 23 (Dkt. 140). This is presumably a reference to testimony from Marianne McKissick, a former Corizon employee who testified in a different case that 407-requests were denied 99% of the time. McKissick was never disclosed as a witness, and the Corizon Defendants argue that her testimony should be excluded. Corizon Def. Reply at 2 (Dkt. 148). The Court agrees. At any rate, Lonzo does not adequately explain how this alleged refusal of 407-requests bears on her case, other than to say that it shows that Defendants intentionally delayed treatment – but LaNore's 407-request was approved the day he submitted it.

### 2. Karen Rich

Rich had only two interactions with Majors.  On July 23, 2014, Majors kited that he was diagnosed with MS in 2005, but had not received treatment since being in MDOC custody.  2d Add'l MDOC Records at PageID.2122.  Rich responded that she would follow up with chart review and an appointment, id., and Majors saw P.A. LaNore about three weeks later, on August 12, 2014.  (Majors also saw Blohm on August 10.)  Rich also saw Majors on September 18, 2014 to check up on results from magnesium citrate that he was given for constipation, when she noted his "slow, steady gait."  MDOC Medical Records at 67.

Lonzo argues that Rich "sat back" while Majors informed MDOC staff of his medical needs, despite knowing that he had been previously diagnosed with MS.  Pl. Resp. to MDOC Defs. Mot. at 19.  She contends that Rich had an independent duty to ensure that Majors received treatment.  Id. at 20.

When Majors complained that he had not received treatment regarding his MS, Rich ensured that he received an appointment with a medical provider who, unlike her, could diagnose his illness and prescribe medication.  See Rich Aff., Ex. H to MDOC Defs. Mot., ¶¶ 14-15 (Dkt. 145-9).  Lonzo does not explain how these actions show a disregard for a risk of substantial harm to Majors.  Rich reasonably followed the medical judgment of professionals with the ability to diagnose and treat Majors.  As such, the § 1983 claim against her is dismissed.

### 3. Joel Evertsen

Lonzo notes that Evertsen scheduled Majors with nursing on August 8, despite knowing that registered nurses could neither diagnose multiple sclerosis nor prescribe medication to treat the disease.  Pl. Resp. to MDOC Defs. Mot. at 18.  She argues that a jury could find this treatment unreasonable.

The Court disagrees. Majors' kite said, "I would like a follow up meeting with health services about my MS. I informed the nurse upon my arrival to west shoreline last month (July) about my MS and need for treatment." MDOC Medical Records at 23. Given that Majors mentioned a nurse in his kite, it is reasonable for Evertsen to schedule him with a nurse. Further, Majors saw LaNore, a PA, on August 12 – merely four days after sending his kite.

Evertsen also responded to a kite from Majors a week later (August 16, 2014), saying that he was having trouble sleeping. Evertsen responded that this sounded like a mental health issue, not medical, and forwarded Majors' request to mental health. Id. at 36. Five days later, Evertsen gave Majors a walker after observing Majors' unsteady gait. Evertsen also said that he would talk to behavioral health to see if he could be seen earlier than August 24 since Majors' primary concern was a lack of sleep. Id. at 37. Evertsen also noted Majors' history of MS. Evertsen talked to LaNore about Majors' treatment on September 2. See id. at 54.

Taking the facts in the light most favorable to Lonzo, Evertsen delayed for two weeks (from the August 16 kite until his September 2 talk with LaNore) in seeking additional treatment for Majors. For the same reasons as discussed above with LaNore, this delay is not unreasonable; nor can it alone show deliberate indifference to Majors' medical needs. The claim against Evertsen is dismissed.

### 4. Dorinda Blohm

Finally, with respect to Blohm, Lonzo again argues that it was unreasonable for Blohm to respond simply that Majors was "scheduled with nursing" when he complained of having problems walking. Pl. Resp. to MDOC Mot. at 18-19. She contends that a reasonable jury could find that she knew Majors had a serious medical need, knew he was not being treated, and scheduling appointments with people who could not help him was unreasonable. Id. at 19.

When Blohm saw Majors on August 10, she referred him to the medical provider for further treatment. Majors saw LaNore two days later, on August 12. Majors' kite, to which Blohm responded that he was scheduled with nursing, was dated August 9. Thus, three days after Blohm received Majors' kite, he saw a medical provider. He also saw Dr. Susan Howard, an MD, on August 26. See MDOC Medical Records at 46.

Blohm saw Majors on August 24 when he became light-headed; she also saw him on September 5, when he told her that he was concerned about not having treatment for MS. Blohm noted that Majors was "instructed again that we are awaiting testing done leading up to diagnosis." Id. at 57. Blohm was clearly aware of the circumstances regarding Majors' treatment.

However, as with the other co-Defendants, Lonzo does not show that Blohm's actions indicate a deliberate indifference toward Majors' medical needs. Blohm was attentive to Majors' requests and followed the judgment of medical providers who have the capability to diagnose and prescribe treatment for patients. Lonzo does not explain why Blohm was expected to second-guess the medical judgment of LaNore, a PA, who believed that he needed to confirm Majors' diagnosis before starting treatment. Lonzo cannot satisfy the subjective component of her claim against Blohm, and it therefore must be dismissed.

### C. Wrongful Death

Lonzo also brings a claim under Michigan's Wrongful Death Act, Mich. Comp. Laws § 600.2922. The parties agree that this Act does not create a separate cause of action. See Kane v. Rohrbacher, 83 F.3d 804, 805 (6th Cir. 1996) ("[U]nder Michigan precedent it is clear that a wrongful death action is derivative, rather than independent, of a decedent's underlying tort action."). Lonzo argues that she is not required to plead an underlying state claim and that her § 1983 claim is sufficient. Pl. Resp. to MDOC Defs. Mot. at 20-22. However, as the Court has

dismissed all of the § 1983 claims, there is no underlying action for the Wrongful Death Act claim. Accordingly, this claim too is dismissed.

## IV.    OTHER PENDING MOTIONS

There are several pending motions that merit brief discussion. First, Lonzo filed a motion to exclude the expert testimony of the Corizon Defendants' witnesses proffered in support of their motion for summary judgment (Dkt. 127). The Court did not rely on the expert reports in reaching its decision on the Corizon Defendants' motion for summary judgment. Accordingly, the Court will deny the motion as moot.

Second, Lonzo filed a motion to re-open limited discovery in order to respond to evidence attached to the Corizon Defendants' reply brief (Dkt. 150). The Corizon Defendants attached an affidavit from Dr. Keith Papendick, the Utilization Management Outpatient Medical Director for Corizon, in order to respond to testimony from Marianne McKissick, a physician's assistant who worked for Corizon. As the Court discussed briefly _supra_, it did not consider McKissick's testimony for purposes of the instant summary judgment motions. Therefore, there is no need to consider Papendick's affidavit in response, nor for the parties to spend time for discovery on an issue that is not relevant to this case. Lonzo's motion is denied.

The other pending motions in this case (Dkts. 143, 163, 164) are denied as moot.

## V.    CONCLUSION

For the reasons provided, the Corizon Defendants' motion for summary judgment (Dkt. 113) and the MDOC Defendants' motion for summary judgment (Dkt. 145) are granted; all other pending motions (Dkts. 127, 143, 150, 163, 164) are denied.

SO ORDERED.

Dated:  March 18, 2019                     s/Mark A. Goldsmith
     Detroit, Michigan                     MARK A. GOLDSMITH
                                               United States District Judge